## ARKANSAS BOARD of EMBALMERS
## and FUNERAL DIRECTORS *v.* Billy REDDICK

05-952                                                   233 S.W.3d 639

### Supreme Court of Arkansas
### Opinion delivered April 13, 2006

*Mike Beebe,* Att'y Gen., by: *Arnold M. Jochums,* Ass't Att'y Gen., for appellant.

*R. Blake Marsh,* for appellee.

JIM HANNAH, Chief Justice. The Arkansas Board of Embalmers and Funeral Directors appeals a decision of the Bradley County Circuit Court reversing the Board's decision to suspend Billy Reddick's license as a funeral director for a period of

two years. This court assumed jurisdiction of this case based on an issue of first impression and statutory interpretation pursuant to Ark. Sup. Ct. R. 1-2(1) and (6).

*Facts*

In February 2003, Bobbie Lovett suffered a heart attack and was taken to the nearest hospital, which was located in Monroe, Louisiana. Anne Booker, who characterizes herself as Lovett's goddaughter, went to Monroe upon learning of Lovett's heart attack. Lovett's cousin, Martha Thomas, also visited Lovett in the hospital in Monroe.

The doctors in Louisiana determined that Lovett had circulatory blockages that required intervention. However, she wished to undergo any procedure in Little Rock under the care of doctors she knew. The doctors told Lovett and Booker that although she was stable to be transported, her insurance would not pay for transport to Little Rock because the required procedure could be performed in Monroe. Booker told Lovett that she did not have the funds to pay for Lovett's transport, but that they could call Billy Reddick to see if he could help.

Reddick knew Lovett personally. Although he is the owner of the Reddick Funeral Home and a licensed funeral director, Reddick also served as pastor to Lovett's church in the early 1990s. According to Reddick, he and Lovett became close while he served as her pastor, and they remained close over the years. He considered himself her godson.

Booker called Reddick, who soon appeared in Monroe. According to Booker's testimony, Reddick offered to transport Lovett to Little Rock, and he had Lovett execute a power-of-attorney. Booker testified that she specifically asked Lovett if she knew what the power-of-attorney was and whether she wanted to sign it. The hospital would not allow them to transport Lovett to Little Rock without the power-of-attorney. She also testified that they could have used Lovett's credit card to charge the trip to Little Rock, but did not do so because Lovett did not offer it.

Reddick testified that he felt that he had no right to act on Lovett's behalf without the power-of-attorney. He also testified that he explained to her that he could not help her with the hospital and her business if he had no authority to do so. Booker testified that Lovett represented to the hospital that she and

Reddick were her son and daughter. She also testified that Lovett told the hospital in Little Rock that Reddick was her son and to do whatever he asked.

Lovett died in the hospital in Little Rock on February 13, 2003. At the moment of her death, Reddick and Booker were present. Martha Thomas was on her way to the hospital at the time but did not arrive until after Lovett's death. Lovett's only blood relations at the time of her death were three cousins, Hazel Buford, of Grand Rapids, Michigan, Eldon Joel Kinlow, of Milwaukee, Wisconsin, and Thomas, of Grady, Arkansas.

Thomas testified that upon her arrival at the hospital in Little Rock, she met Reddick coming out of the restroom with Lovett's purse in his hand. She also testified that when she suggested that someone needed to call a funeral home, he stated that he had already taken care of it. She further testified that when she raised the issue of Lovett's business matters, he stated that he had a power-of-attorney[1] and was taking care of her business.

She also testified that Reddick met with the cousins a day or so after Lovett's death, handed them a garbage bag containing papers that he had removed from Lovett's home and when confronted about funeral arrangements, told them that "cousins don't count." She also asserted that Reddick waved the power-of-attorney in their faces, and she said to him, "I'll make you eat it." Thomas characterized the power-of-attorney as "phony," noting that it was poorly typed and notarized after Lovett's death. Thomas accused Reddick of refusing to allow them to pick flowers for the casket spray and refusing to allow them a choice in the funeral and arrangements. She also accused Reddick of entering Lovett's house and removing things, of trying to acquire Lovett's car, and of misrepresenting himself as Lovett's son. Thomas also testified that she and Kinlow found a will at Lovett's house that named her and Kinlow as executors.

Thomas accused Reddick and Booker of ransacking Lovett's house for the will but that they failed to find it. She attributed food left all over in the house to Reddick and Booker. She said that Reddick took a coat from Lovett's house; however, Booker testified that the coat was in Monroe and was taken by her and Reddick to the hospital in Little Rock.

---

[1] The record contains no power-of-attorney.

Kinlow testified that he met with Reddick at the Reddick Funeral Home prior to the funeral, along with Thomas and Buford, and that Reddick showed them the power-of-attorney but refused to give them a copy. He stated that Reddick showed them a bill for the funeral, and they refused to sign it, so Reddick signed it as the arranger. Reddick told them that he would pay for the funeral because Lovett was his mother. Kinlow also stated that he spoke with a "young man" in Dumas who cared for Lovett's house, and that he told Kinlow that Reddick called saying if he did not get the keys to get in the house, he would "kick the door in." Other evidence showed that Reddick had access to keys to the house.

Reddick denied that the cousins were excluded from making the arrangements. He stated that on Lovett's visits to the funeral home to visit him, she showed him the casket she wanted and stated what else she wanted. He said she did not prearrange. He testified that even though he told the cousins that what he had arranged was what she wanted, they did not want to use the insurance proceeds for her funeral.

Booker testified that pursuant to Lovett's wishes, she went to Lovett's home and removed dresses and jewelry, that these items were taken to the funeral home to dress Lovett, and that the unused items were returned to the cousins. Reddick testified that in taking care of Lovett's business, he went to her house and removed various papers, and that he went and got what she had told him to take. Booker testified that Reddick paid for the transport and funeral. According to Reddick, he filed a claim against the estate for the funeral because his attorney told him to do so, but that he was not seeking repayment.

### Standard of Review

Our review of the decisions of administrative agencies is limited in scope. *Ark. Dep't of Human Servs. v. Bixler*, 364 Ark. 292, 219 S.W.3d 125 (2005). With respect to issues of fact, the decision on credibility and weight of the evidence is within the administrative agency's discretion, and it is the prerogative of the agency to believe or disbelieve any witness and to decide what weight to accord that evidence. *Id.* With respect to legal issues, administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts, to determine and analyze legal issues affecting their agencies. *Austin v. Centerpoint Energy ARKLA*, 365 Ark. 138, 226 S.W.3d 814 (2006).

The standard of review to be used by both the circuit court and the appellate court is whether there is substantial evidence to support the agency's findings. *Ben, supra.* Thus, the review by appellate courts is directed not to the decision of the circuit court, but rather to the decision of the administrative agency. *Id.* The circuit court or appellate court may reverse the agency decision if it concludes that:

> (h) [T]he substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the agency's statutory authority;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error or law;
>
> (5) Not supported by substantial evidence of record; or
>
> (6) Arbitrary, capricious, or characterized by abuse of discretion.

Ark. Code Ann. § 25-15-212(h) (Repl. 2002). In *Bixler*, we stated:

> Substantial evidence is valid, legal, and persuasive evidence that a reasonable mind might accept as adequate to support the agency decision. *Arkansas Prof'l Bail Bondsman v. Oudin,* 348 Ark. 48, 69 S.W.3d 855 (2002). The challenging party has the burden of proving an absence of substantial evidence and must demonstrate that the proof before the administrative agency was so nearly undisputed that fair-minded persons could not reach its conclusion. *Id.* The question is not whether the evidence would have supported a contrary finding, but rather whether it supports the finding that was made. *Id.*

*Bixler,* 364 Ark. at 299, 219 S.W.3d at 130.

### The Decision of the Board

The Board concluded that in violation of the Rules of the Board of Embalmers and Funeral Directors, Reddick:

1. Removed the body of the deceased from the hospital to his funeral home without first obtaining authorization from the family and without authority of the arrangers;[2]

2. Reddick without authorization of the family, went to the home of the deceased and removed papers, jewelry and clothing;

3. At the time of the death Respondent Reddick removed the deceased's purse, containing credit cards and safety deposit keys, without authorization of family members;

4. Reddick did not explain to the family members that Mrs. Lovett had an insurance policy with Sims Funeral Policy of El Dorado;

5. Funeral director Reddick acted as the arranger and did not provide family members with a Statement of Goods and Services Selected prior to the funeral; and

6. Reddick violated Board Rule XIV–Funeral Services Practices, paragraph 3, by failing to make every reasonable attempt to fulfill the needs and desires of the arrangers.

Any authority to act granted by the power-of-attorney terminated at death. The power of agency ends with death of the principal. *Oviatt v. Garretson*, 205 Ark. 792, 171 S.W.2d (1943). Reddick had no blood relation to Lovett.

At Lovett's death, it fell to her closest blood relative to decide what was to be done with her remains. This court in *Travelers Insurance Co. v. Smith*, 338 Ark. 81, 89, 991 S.W.2d 591, 596 (1999), stated:

> A quasi-property right in dead bodies vests in the nearest relatives of the deceased, arising out of their duty to bury their dead. 22A Am. Jur. 2d Dead Bodies § 3 (1988). *See also Neff v. St. Paul Fire & Marine Ins. Co.*, 304 Ark. 18, 799 S.W.2d 795 (1990). This right corresponds in extent to the duty from which it arises, and may include rights to possession and custody of the body for burial, to prevent the corpse from disturbances after burial, or to remove it to

---

[2] Under Rule 1(3) of the Rules of the Board of Embalmers and Funeral Directors, an arranger is "the person or persons arranging for any type service following or in advance of death."

a proper place. Courts have generally based civil liability for wrongful acts with regard to a dead body on the interference with the right of burial. *Id.*

Similarly this court in *Teasley v. Thompson*, 204 Ark. 959, 165 S.W.2d 940 (1940), held that in the absence of a spouse timely asserting a right to care for the body, the trusteeship of care of the body goes to the next of kin in succession. Thus, it is clear that it was up to Lovett's cousins to decide what was to be done with Lovett's remains. Reddick was a usurper when he stepped in and removed from the family the right to make decisions on the arrangements for Lovett's remains in the first instance. Rather, he took control and now asserts that had the family expressed wishes, he would have acquiesced.

■ With respect to the remaining conclusions reached by the Board, the evidence was in conflict. We cannot say that a reasonable mind might not accept the facts deduced as adequate to support the agency decision. Nor can we say that Reddick prevailed in his obligation of proving an absence of substantial evidence and that the evidence before the administrative agency was so nearly undisputed that fair-minded persons could not reach its conclusion. The question is one largely of credibility, and we defer to the Board as the finder of fact.

Affirmed.